*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

B'DOUR MOHAMMED-ALI AL-YASARI,

        Defendant-Appellant.

UNPUBLISHED
July 14, 2026
9:37 AM

No. 362096
Ingham Circuit Court
LC No. 19-000220-FC

Before: M. J. KELLY, P.J., and PATEL and KOROBKIN, JJ.

PER CURIAM.

Defendant appeals by right her jury convictions of first-degree premeditated murder, MCL 750.316(1)(a), on an aiding-and-abetting theory, MCL 767.39, and of conspiracy to commit first-degree premeditated murder, MCL 750.157a(a). Defendant argues that she was deprived of the right to the effective assistance of counsel, that the evidence was insufficient to support her convictions and the verdict was against the great weight of the evidence, that her mandatory sentence of life imprisonment without the possibility of parole is unconstitutionally cruel or unusual punishment, and that newly discovered evidence entitles her to a new trial. Finding no error requiring reversal, we affirm.

## I. BACKGROUND AND FACTS

On the evening of February 4, 2019, defendant's husband, Ammar Al-Yasari,[1] was killed at the couple's home with an ax. The prosecution's theory at trial was that defendant's boyfriend,

---

[1] Because Ammar Al-Yasari shares the same last name as defendant, we refer to him by his first name.

Jacob Ficher,[2] killed Ammar and that Ficher was able to gain access to the Al-Yasari home to ambush Ammar after defendant remotely disarmed the home's security system.

In 2018, defendant and Ficher began a relationship while defendant was married to Ammar. Evidence from defendant and Ficher's cell phones reflected that they communicated through various messaging applications. From the cell phone data that the police found, defendant repeatedly complained to Ficher of physical and emotional abuse that she suffered at Ammar's hands and she repeatedly expressed a desire to harm or leave Ammar. Ficher, who boasted of being a fighter and "difficult to kill," repeatedly threatened to harm or kill Ammar. They discussed the fact that Ficher had a temper and the likelihood that a physical confrontation would ensue if Ammar tried to come after him.

Four days before Ammar's death, Ficher purchased an ax and a bottle of bleach at a supermarket using a red pickup truck, which is the type of vehicle that defendant drove. The ax was never found, but a receipt for its purchase and the ax's packaging were later found in Ficher's bedroom. Defendant did not enter the store with Ficher, and there was no direct evidence that she knew that he purchased the ax.

In the early afternoon on the day of the murder, defendant's work computer was used to search for instructions on how to delete cell phone data. Defendant then appeared unhurried as she picked up her children from school and childcare, and footage from the camera on her car's dashboard showed that she drove past her home while saying something to the effect of "[l]et me disarm the house." The alarm company's records showed that the home's alarm system was remotely disarmed at 5:32 p.m.

Ficher's cell phone data from around the same time showed that he was traveling toward the Al-Yasari home. Ammar was still at work when a neighbor noticed an individual enter the home with a tote bag. Ammar left work at 6:25 p.m., later than his usual departure time of 5:45 because he was working with a client. At 6:51 p.m., defendant checked some books out of the local library. Shortly after, defendant stopped at a supermarket with the children, and eventually began her trip home at approximately 7:45 p.m. Defendant went inside the home briefly at 7:57 p.m., before she texted a friend and asked them to come pick up her children. At the house, the friend described defendant as calm when defendant told her that she had "walked in and [her] husband [was] on the ground." Defendant called 911 at 8:05 p.m.

Upon their arrival, the first police responders described defendant as upset, distraught, or hysterical, and the officers that conducted the initial walkthrough of the home noticed a strong odor of bleach. They also reported seeing Ammar's body on the ground in a pool of blood and a clear liquid, and that there was blood splatter on the walls that appeared to have been wiped down. Ammar was found to have sustained 24 "chop wounds" inflicted with "an axe, a hatchet, a machete, a meat cleaver, something along those lines," with the medical examiner testifying that

---

[2] Ficher was separately tried and convicted of first-degree premeditated murder, MCL 750.316(1)(a), and conspiracy to commit first-degree murder, MCL 750.157a and MCL 750.316. *People v Ficher*, unpublished opinion of the Court of Appeals, issued December 21, 2021 (Docket No. 352991). The jury in defendant's case was not made aware of Ficher's convictions.

19 of the wounds would have been immediately and independently fatal. It was also observed that Ammar's blood was abnormally coagulated, consistent with it having been mixed with bleach. No DNA from Ficher was found in the Al-Yasari home, and Ficher's roommate testified that he saw no blood or bleach on Ficher when Ficher arrived home that night. The roommate did, however, state that Ficher said some things after the murder that suggested to the roommate that Ficher had committed a homicide.

Officers initially believed that defendant was a victim instead of a coconspirator, and she agreed to an interview at the police station. The police asked defendant whether she had any relationships outside of the marriage, and she admitted that she had a "friend with benefits." Despite describing this friend as a "psycho," she refused to disclose the friend's name. In conjunction with the interview, the police requested defendant's cell phone. Even though several messages between defendant and Ficher had been deleted, data from defendant's cell phone revealed that the two were in a romantic relationship.

Defendant was eventually charged with first-degree premeditated murder, MCL 750.316(1)(a), on an aiding-and-abetting theory, MCL 767.39, and conspiracy to commit first-degree premeditated murder, MCL 750.157a(a). At her jury trial, the defense did not call any witnesses. The defense's strategy was to concede that Ammar had been murdered and that defendant was having an affair, but cast doubt upon whether Ficher was the killer and whether defendant was involved. The defense accordingly argued that the prosecution had not established that Ficher actually committed the murder or that defendant even knew that Ficher had an ax, and that it made sense for defendant to turn off the alarm to the house before she got home. The defense pointed to the imprecision of cell phone data placing Ficher at the Al-Yasari home and emphasized that no blood or bleach from the scene was associated with Ficher. The defense also asserted that the interrogation of defendant by a seasoned officer and her reluctance to confess to an affair explained her evasiveness during the police interview.

The jury found defendant guilty as charged, and the trial court sentenced defendant to concurrent sentences of life imprisonment without parole.

Defendant now appeals.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first contends that she is entitled to a new trial because she received ineffective assistance of counsel. We disagree.

Overall, defendant takes issue with trial counsel's strategy of contesting the prosecution's theory that Ficher killed Ammar. Defendant essentially argues that trial counsel should have pursued a different strategy of conceding that Ficher killed Ammar but contesting the prosecution's theory that defendant intended to assist or plan a murder. Consequently, defendant argues that trial counsel was ineffective for failing to present testimony from Ficher that defendant describes as exonerating. Defendant further argues that trial counsel was ineffective for failing to communicate the defense strategy to defendant, which resulted in defendant's uninformed decision

not to testify. As explained below, we conclude that neither argument establishes that defendant is entitled to relief.

"A claim of ineffective assistance of counsel presents a mixed question of law and fact." *People v Jones*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 362854); slip op at 9. We review a trial court's findings of fact for clear error and "the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id*. (quotation marks and citation omitted).

The United States and Michigan Constitutions guarantee criminal defendants the right to effective assistance of counsel. *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023), citing Const 1963, art 1, § 20, US Const, Am VI, and *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "To establish a claim of ineffective assistance of counsel a defendant must show [1] that counsel's performance was deficient and [2] that counsel's deficient performance prejudiced the defense." *People v Fyda*, 288 Mich App 446, 450; 793 NW2d 712 (2010). Put another way, "to obtain a new trial because of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that that outcome would have been different." *Yeager*, 511 Mich at 488 (quotation marks and citation omitted). Defendant must overcome a strong presumption of effective assistance of counsel. *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Notably, a trial strategy is not deficient merely because it is unsuccessful or because it entailed taking calculated risks. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020). And regarding the "prejudice" prong, "[a] reasonable probability [of a different outcome means] a probability sufficient to undermine confidence in the outcome." *Yeager*, 511 Mich at 488 (quotation marks and citations omitted). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v Richter*, 562 US 86, 112; 131 S Ct 770; 178 L Ed 2d 624 (2011). But a defendant need not prove by a preponderance of the evidence that she would have been acquitted, and the weaker the evidence in support of a guilty verdict, the lower the threshold is for finding prejudice. *People v Urbanski*, 348 Mich App 90, 103; 17 NW3d 430 (2023).

A defendant bears "the burden of establishing the factual predicate for [their] claim of ineffective assistance of counsel[.]" *People v Solloway*, 316 Mich App 174, 189; 891 NW2d 255 (2016) (quotation marks and citation omitted). Generally, when there is no *Ginther*[3] hearing, our review is limited to errors apparent on the record, see *People v Buie (On Remand)*, 298 Mich App 50, 61; 825 NW2d 361 (2012), but we may also consider a defendant's offer of proof to determine whether to remand for a hearing to develop a factual record in support of an ineffective-assistance claim, see MCR 7.211(C)(1)(a).

1. FAILURE TO INTRODUCE TESTIMONY OF UNAVAILABLE CODEFENDANT

Defendant first argues that her trial counsel was ineffective for failing to introduce the testimony that Ficher gave at his own trial, which defendant describes as exonerating. Under MRE 804(b)(1), an unavailable declarant's former testimony may be admitted against a party that

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-4-

had an opportunity and similar motive to cross-examine the declarant. According to defendant's offer of proof, trial counsel considered calling Ficher at trial but ultimately decided not to following Ficher's stated intent to assert his Fifth Amendment right to remain silent. A witness who asserts their Fifth Amendment right not to testify is considered unavailable under MRE 804(a), so defendant asserts that Ficher's former testimony would have been admissible.

Defendant argues that Ficher's testimony was potentially exonerating because he testified at his trial that defendant "thought I was just going in there to talk" to Ammar, not to hurt him, and that is why defendant turned off the alarm for him. Defendant also highlights Ficher's testimony that Ficher sought to help defendant divorce Ammar safely because Ammar had threatened to kill her if she left. Ficher also testified that defendant questioned him about the contents of the grocery bag containing the ax and told him that he did not need to resort to violence.

According to defendant, failing to introduce Ficher's testimony prejudiced the defense because it left the record with no evidence explaining why defendant turned off her home security alarm as she drove past the house at 5:32 p.m. The defense presented no witnesses, leaving trial counsel to argue in closing that defendant turned off the security system because the alarm went off, as it often did, and only defendant, who was likely the household manager of the alarm, knew the password. Counsel also suggested that defendant turned off the alarm before going home because the alarm would go off when the garage door was opened. Finally, counsel stated that Ammar knew the alarm was off and he was unconcerned.

Even assuming without deciding that defendant would have succeeded in having Ficher's testimony admitted under MRE 804(b)(1), defendant has not demonstrated that trial counsel's trial strategy was unreasonable. Although defendant describes Ficher's testimony as exculpatory, in fact Ficher's testimony potentially inculpated defendant in several respects. First, Ficher's testimony that defendant turned off the alarm for him could support an inference that defendant knowingly aided Ficher and conspired with him to murder her husband. Indeed, a previous jury convicted Ficher of conspiracy to commit first-degree murder despite his testimony that he told defendant that he was only confronting Ammar for a conversation. Second, Ficher's testimony about the ax would prove that defendant was aware that Ficher purchased a weapon. At defendant's trial, the only evidence that defendant knew about the ax purchase at all was circumstantial—video surveillance captured a vehicle matching the make and color of defendant's at the supermarket at the time of purchase, and Ficher's roommate testified that Ficher and defendant returned from the supermarket together. Third, Ficher's testimony was incompatible with a defense strategy to challenge the prosecution's theory that Ficher killed Ammar, as Ficher admitted in his testimony that he did so.[4] Therefore, although parts of Ficher's testimony might

---

[4] Defendant suggests that if trial counsel had simply conceded that Ficher killed Ammar, the prosecution would have no need to introduce "gruesome" evidence regarding the details of Ammar's injuries. But "[t]he prosecution must carry the burden of proving every element beyond a reasonable doubt, regardless of whether the defendant specifically disputes or offers to stipulate any of the elements." *People v Mills*, 450 Mich 61, 69 & n 5; 537 NW2d 909, mod 450 Mich 1212 (1995). Defendant has not shown that such a stipulation would have changed the trial court's

have been helpful if believed by the jury, introducing the testimony also would have provided significant additional evidence that the jury could use to support a finding of defendant's guilt. Trial counsel's failure to introduce such evidence did not fall below an objective standard of reasonableness. *Yeager*, 511 Mich at 488.

Given that much of Ficher's testimony inculpated defendant, defendant has also not demonstrated that introducing the testimony would have had a reasonable probability of making a difference at trial. While counsel is not necessarily ineffective for deciding to take a calculated risk, *White*, 331 Mich App at 149, counsel is also not necessarily ineffective for declining to take risks. Because defendant has not shown that her proposed alternative strategy of introducing testimony from Ficher would have had a reasonable probability of success, trial counsel was free to choose the defense he thought was best. See *People v Pickens*, 446 Mich 298, 324-325; 521 NW2d 797 (1994). And because defendant has not established that the strategy chosen by trial counsel was unreasonable given the circumstances, she has not established that she received ineffective assistance of counsel. Nor has she established that remanding for an evidentiary hearing is necessary when she has not shown that her alternate strategy had a reasonable probability of a different outcome.

## 2. FAILURE TO COMMUNICATE DEFENSE STRATEGY

Defendant also argues that trial counsel performed ineffectively by failing to communicate the defense strategy to her, resulting in defendant making an uninformed decision not to testify, which in turn prejudiced the defense because, again, the jury never learned that she disabled the security system to allow Ficher to talk to Ammar.

A defendant facing criminal charges has a fundamental constitutional right to testify at trial, US Const, Am V, VI, XIV; Const 1963, art 1, §§ 17, 20, and has the ultimate decision on whether to testify. *People v Bonilla-Machado*, 489 Mich 412, 419; 803 NW2d 217 (2011) (citations omitted). Counsel must advise the defendant of the right to testify. *Id*. If a defendant decides not to testify, the right is deemed waived. *People v Spaulding*, 332 Mich App 638, 657; 957 NW2d 843 (2020). Here, defendant stated on the record that she exercised her right to remain silent knowingly and voluntarily. Generally, when the right to testify is waived, any claimed error is extinguished by the waiver and appellate review is not available. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). But because defendant frames her challenge as one of ineffective assistance of counsel, we review it on its merits. See *People v Simmons*, 140 Mich App 681, 685-686; 364 NW2d 783 (1985).

Defendant avers that, had trial counsel communicated to her that the defense strategy was to argue that Ficher was not the killer and that no evidence would be presented as to why she disabled the security alarm, she would have chosen to testify. And in testifying, she would have explained to the jury that she turned off the alarm to enable Ficher to go inside and talk with Ammar but did not know that Ficher would kill him.

---

decision to admit the evidence given the prosecution's burden of proof or that excluding the evidence would had a reasonable probability of changing the trial's outcome.

Overall, defendant's challenge fails for largely the same reasons as discussed above. If defendant had chosen to testify as indicated, her testimony would have effectively conceded not only that Ficher killed Ammar, but also that defendant took affirmative steps to enable Ficher to enter the home for the purpose of confronting Ammar. Given that such evidence could support an inference that defendant committed the charged crimes, defendant cannot demonstrate that her testimony would have had a reasonable probability of producing a different outcome at trial. Nor has defendant established that remanding for an evidentiary hearing is necessary.

## B. SUFFICIENCY AND GREAT WEIGHT OF THE EVIDENCE

Defendant next contends that the prosecution failed to present sufficient evidence to support her convictions and that the evidence preponderates against her convictions. We disagree.

"We review de novo the question of evidentiary sufficiency, viewing the evidence in the light most favorable to the prosecutor to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Evans*, 335 Mich App 76, 85; 966 NW2d 402 (2020). Constitutionally sufficient evidence of guilt exists where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Id.* at 86 (quotation marks and citation omitted). "[C]ircumstantial evidence that amounts to 'mere speculation' cannot support a conviction," but "[s]o long as an inference drawn from circumstantial evidence is reasonable, it can be sufficient to support a defendant's conviction beyond a reasonable doubt." *People v Gash*, 351 Mich App 196, 206; 34 NW3d 637 (2024). When reviewing the sufficiency of the evidence, we must "draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

This Court reviews a trial court's determination that a conviction was not against the great weight of the evidence for an abuse of discretion, *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009), which occurs when a trial court chooses an outcome that falls outside the range of reasonable and principled outcomes, *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "We review a great-weight challenge by deciding whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Anderson*, 341 Mich App 272, 276-277; 989 NW2d 832 (2022) (quotation marks and citation omitted). "Generally, a verdict is against the great weight of the evidence only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Id.* at 277 (quotation marks and citation omitted).

## 1. AIDING AND ABETTING MURDER

Defendant was convicted of first-degree premeditated murder under an aiding-and-abetting theory. There are "three elements necessary for a conviction under an aiding and abetting theory: (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement." *People v Robinson*, 475 Mich 1, 6-7; 715 NW2d 44 (2006) (cleaned up). Even if the person did not specifically intend that the crime actually be committed, the person can be guilty of "those crimes that are the natural and

probable consequences of the offense [they intend] to aid or abet." *Id*. at 9, 14-15. "The quantum of aid or advice is immaterial as long as it had the effect of inducing the crime." *People v Ventour*, 349 Mich App 417, 426; 27 NW3d 660 (2023) (quotation marks and citation omitted). "An aider or abettor's state of mind may be inferred from all the facts and circumstances, including a close association between the defendant and the principal, and the defendant's participation in the planning or execution of the crime." *Id*. at 426-427.

In this case, the aiding-and-abetting conviction was primarily supported by circumstantial evidence. Regarding the first element, commission of the crime, there is no dispute that Ammar was murdered and there was ample evidence that Ficher committed first-degree premeditated murder. That is, Ficher had repeatedly threatened to harm or kill Ammar in text messages to defendant, cell phone evidence placed Ficher near the home, Ammar was killed with a weapon consistent with an ax that Ficher had purchased several days before the murder, and evidence suggested that the crime scene was cleaned with bleach, which Ficher had purchased along with the ax. The jury could infer premeditation from Ficher taking a potentially dangerous weapon to the home, and the number of independently fatal injuries that Ammar sustained supports an inference of intent to kill. See *People v Dillard*, 303 Mich App 372, 378; 845 NW2d 518 (2013). And shortly after the murder, Ficher's roommate observed Ficher acting out of character, helped Ficher activate a new phone, and observed text messages from Ficher that suggested that Ficher might have committed a homicide.

Regarding the second element, acts or encouragement, the record supports that defendant assisted Ficher by remotely disarming the alarm to the home. Moreover, the evidence suggested that she did so while driving *away from* the home, and she did not get home until almost an hour and a half later. The jury could reasonably infer that defendant did not disarm the alarm in anticipation of her own imminent arrival. Taken together, the jury could reasonably find beyond a reasonable doubt that defendant remotely disarmed the home's alarm to permit Ficher to enter and kill Ammar.

Regarding the third element, intent or knowledge, defendant need not have specifically intended that first-degree premeditated murder be committed if she knew (1) that Ficher intended to commit first-degree premeditated murder or (2) that first-degree premeditated murder was a natural and probable consequence of the crime that she intended to commit when she let him into the home. See *Robinson*, 475 Mich at 6-7, 9, 14-15. Because it can be difficult to prove intent directly, "minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

The communications between Ficher and defendant revealed that Ficher discussed his penchant for fighting and his desire to hurt Ammar. In one text exchange, defendant asked Ficher if he really liked to fight, and Ficher stated that it was "better that I'm a fighter if [Ammar] decides to come after me and [I'm] not someone who will be killed easy," to which defendant responded by asking Ficher to "explain on Snap," referring to the Snapchat service, which does not store messages. A photograph of a conversation between Ficher and defendant sent in early February revealed that when Ficher asked defendant to "tell me how much [Ammar] hurts you," defendant said, "[f]or 10 years he has made me feel worthless, a slave, a prisoner" and "calls me names, makes fun of me, calls me crazy and he's been forcing himself on me, hurting me both emotionally

and physically." Defendant also sent a (later-partially deleted) message stating, "I need a divorce or I'm going to kill him right now." There was also evidence that Ammar had a handgun and concealed pistol license. Further, Ficher's roommate discussed that defendant was with Ficher when the ax and the bleach were bought. In light of the messages in which defendant either threatened to harm Ammar or described her mistreatment at Ammar's hands while Ficher threatened to kill Ammar, who himself had a handgun, the jury could reasonably infer that defendant knew that Ammar's death was a likely consequence of the encounter, irrespective of whether defendant knew that Ficher would kill Ammar.

Although defendant attributes her lies to Ammar and her statements to Ficher to her reluctance to reveal that she was having an affair and was planning to divorce Ammar, and argues that the evidence showed only that she allowed Ficher to speak with her husband, this Court is required to draw all reasonable inferences in support of the jury verdict. See *Nowack*, 462 Mich at 400. Moreover, evidence suggested that defendant sought to cover up her communications with Ficher before the murder. Incriminating text messages between the two related to wishing violence upon Ammar were deleted. Defendant's computer was used to research how to delete her phone's data, including Snapchat, hours before the murder, indicating that she already knew that she would imminently need to destroy evidence. Defendant also acted contrary to her usual manner of picking the children up quickly, and she kept them out of the house until well after their bedtimes, again suggesting that she already knew that the murder would occur. In sum, while any single piece of evidence might have an innocent explanation on its own, the circumstantial evidence was supported by reasonable inferences such that the jury could reasonably have found beyond a reasonable doubt that the entirety of the evidence showed that defendant was an active participant in Ammar's murder. See *Gash*, 351 Mich App at 206.

## 2. CONSPIRACY TO COMMIT MURDER

Defendant was also convicted of conspiracy to commit first-degree premeditated murder. "The 'gist' of conspiracy 'lies in the illegal agreement,' " and the crime is complete once the agreement is formed irrespective of whether the conspirators take any overt acts in furtherance of the conspiracy or of whether the goal of the conspiracy is achieved. *People v Seewald*, 499 Mich 111, 117; 879 NW2d 237 (2016) (citation omitted). "Moreover, withdrawal from the conspiracy is ineffective because the heart of the offense is the participation in the unlawful agreement." *People v Cotton*, 191 Mich App 377, 393; 478 NW2d 681 (1991). The conspirators must agree regarding conduct that satisfies all the essential elements of the substantive crime, but they need not agree as to "all the details of the conspiracy." *People v Mass*, 464 Mich 615, 629 n 19; 628 NW2d 540 (2001). "A conspiracy may be proven by circumstantial evidence or may be based on inference," and it "is sufficient that the circumstances, acts, and conduct of the parties establish an agreement." *Cotton*, 191 Mich App at 393.

As previously stated, the evidence supports an inference that defendant took several overt acts that indicated that she participated in both the execution of the murder and its planning. Specifically, defendant disabled the alarm system and deleted data from her phone that included messages stating that she wanted Ammar harmed or killed. Even though defendant argues that she disliked violence, the jury could have concluded that defendant merely did not want to carry it out herself. And whether defendant knew about the specific murder weapon is immaterial because that is merely an implementation detail. See *Mass*, 464 Mich at 629 n 19. Taking all the evidence

together, the jury could infer beyond a reasonable doubt that defendant did not merely assist Ficher but also worked with Ficher to plan the murder, establishing her guilt of conspiracy.

### 3. GREAT WEIGHT OF THE EVIDENCE

Defendant argues that the great weight of the evidence preponderates against a finding that defendant knew Ficher intended to kill her husband, that she agreed with Ficher, and that she specifically intended to assist Ficher in committing first-degree murder. Defendant supports her great-weight-of-the-evidence argument with the same points she advanced to challenge the sufficiency of the evidence. Given our discussion above, we disagree that the evidence preponderated against the verdict.

### C. CRUEL OR UNUSUAL PUNISHMENT

Next, defendant argues that a mandatory sentence of life imprisonment without the possibility of parole is cruel or unusual punishment in violation of the Michigan Constitution, see Const 1963, art 1, § 16, when imposed for conspiracy to commit murder and aiding and abetting murder. We review questions of constitutional law de novo. *People v Johnson*, 340 Mich App 531, 542; 986 NW2d 672 (2022). Defendant concedes, however, that our Supreme Court has held that nonparolable life imprisonment for conspiracy to commit first-degree murder is not cruel or unusual punishment. *People v Fernandez*, 427 Mich 321, 333-339; 398 NW2d 311 (1986). Defendant also properly concedes that this Court is bound by that holding. *Paige v Sterling Heights*, 476 Mich 495, 524; 720 NW2d 219 (2006); *Platt Convenience, Inc v Ann Arbor*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 359013); slip op at 13. Because defendant concedes that we are bound by *Fernandez* under MCR 7.215(C)(2), defendant's argument necessarily fails.

### D. STANDARD 4 BRIEF

In defendant's supplemental brief filed *in propia persona*, otherwise known as a "Standard 4" brief,[5] she contends that she should receive a new trial because she recently learned that a postcard that the prosecution introduced into evidence was a written by defendant's cellmate. As a result, or in the alternative, defendant argues that counsel was ineffective for failing to identify and call the cellmate as a trial witness. We disagree.

Courts are reluctant to grant new trials on the basis of newly discovered evidence, so a defendant must show that

> (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. [*People v Grissom*,

---

[5] See Administrative Order No. 2004-6, 471 Mich c, cii (2004).

492 Mich 296, 312-313; 821 NW2d 50 (2012) (quotation marks and citation omitted).]

"When assessing the probability of a different result on retrial, the court must not only take into account the evidence presented at the original trial, but also evidence that would be presented at a new trial." *People v Lemons*, 514 Mich 485, 515; 22 NW3d 42 (2024).

At trial, the prosecution introduced a handwritten postcard sent to Ficher with defendant listed as return addressee while the two were incarcerated that contained the words "Bonnie and Clyde" and "habibi" (which defendant used to refer to Ficher) and referenced August 1, 2018 (the date of defendant and Ficher's anniversary). Defendant now proffers an affidavit from a former cellmate alleging that the cellmate sent the postcard to Ficher on her own initiative without telling defendant because she saw Ficher "looking sad in court" and wanted to do something for Ficher.

Even assuming that the affidavit constitutes newly discovered evidence or that counsel was ineffective for failing to identify and present the witness, defendant's argument for a new trial is unpersuasive because the postcard held relatively little significance concerning the proof of the crime. Further, the prosecutor introduced it briefly and did not mention it during closing or rebuttal arguments. When considering the "evidence that would be presented at a new trial," *Lemons*, 514 Mich at 515, it is not probable that presenting the cellmate as a witness to take credit for what was otherwise a relatively small piece of evidence would make a difference to the outcome. Thus, defendant's new-evidence challenge fails.

### III. CONCLUSION

To summarize, we reject defendant's arguments that trial counsel was ineffective because counsel's strategy was not unreasonable under the circumstances and defendant has not shown a reasonable probability that introducing either Ficher's testimony or defendant's testimony would have changed the trial's outcome. Defendant's argument that insufficient evidence supported her convictions also lacks merit because the circumstantial evidence introduced at trial was supported by reasonable inferences such that the jury could reasonably have found beyond a reasonable doubt that defendant was guilty. Likewise, we reject defendant's argument that the verdict was against the great weight of the evidence. Defendant concedes that we are bound by Supreme Court precedent to reject her contention that her sentence is unconstitutional. And finally, the argument in defendant's Standard 4 brief fails because introducing the proposed evidence would not make a different result probable on retrial.

Affirmed.

/s/ Michael J. Kelly
/s/ Sima G. Patel
/s/ Daniel S. Korobkin

-11-